| | |
|---|---|
| WILLIAM S. AHOLELEI,           )<br>                                                     )<br>            Plaintiff,                       )<br>                                                     )<br>    vs.                                          )<br>                                                     )<br>BARBARA KYSAR; DOCTOR S.   )<br>PADERES, DOCTOR BAUMAN;  )<br>DOES I-V,                                   )<br>                                                     )<br>            Defendants.                 )<br>_____ ) | CIVIL NO. 03 00171 HG-KSC<br><br>**MEMORANDUM IN SUPPORT OF MOTION** |

## MEMORANDUM IN SUPPORT OF MOTION

I.   INTRODUCTION

   A.   Procedural History of Case

On April 14, 2003, Plaintiff inmate William S. Aholelei ("Plaintiff") filed the instant lawsuit for damages pursuant to 42 U.S.C. § 1983, alleging violations of his Fourteenth and Eighth Amendment rights insofar as Defendants Barbara Kysar,[1] Nolan Espinda, and Linda Lingle were deliberately indifferent to his medical needs. On June 3, 2003, Defendants Kysar and Lingle filed a Motion to

---

[1]   Defendant Barbara Kysar, an employee of the Department of Public Safety, passed away during the pendency of this action. Consequently, on January 21, 2004, a Suggestion of Death Upon the Record Under Rule 25(a)(1) was filed by the State. On January 30, 2004, an <u>Amended</u> Suggestion Upon the Record Under Rule 25(a)(1) was filed to reflect that Drs. Paderes and Bauman had been named as Defendants in the Amended Complaint. On May 13, 2004, the Order Dismissing Defendant Barbara Kysar was filed.

Dismiss Complaint.[2] On July 28, 2003, the Court (Honorable Kevin S. Chang) filed its Findings and Recommendation Granting Defendants' Motion to Dismiss Complaint. On September 11, 2003, the Court (Honorable Helen Gilmor) filed its Order Adopting, as Modified, the Findings and Recommendation Granting Defendants' Motion to Dismiss ("Order"). In the Order, the Court concluded that "the pleadings provide a sufficiently clear statement of [Plaintiff's] claim for deliberate indifference to his medical needs." Thus, Plaintiff was allowed 30 days from the filing of the Order within which to file an amended complaint. Plaintiff did so on September 22, 2003.

The Amended Complaint named Barbara Kysar, Doctor S. Paderes (Defendant Sisar Paderes, hereinafter "Dr. Paderes"), and Doctor [Kay] Bauman as Defendants. Previously named Defendants Nolan Espinda and Governor Linda Lingle were not named as defendants in the Amended Complaint.

B.   Plaintiff's Medical Care

Plaintiff allegedly suffered from a kidney condition that was diagnosed during his incarceration at the Halawa Correctional Facility ("HCF"). See Amended Complaint ("Am.Compl.") at 5. This condition caused his kidneys "to swell with tremendous pains." Id. It also caused him to experience a loss of appetite and have blood in his urine. Id. Plaintiff has alleged that Dr. Paderes was

---

[2]   Defendant Espinda had not been served as of the filing of Defendants Kysar and Lingle's Motion to Dismiss.

198979_1.DOC                          2

deliberately indifferent to his medical needs, in violation of the Eighth Amendment. Id. at 6. Plaintiff seeks monetary damages. Id. at 7.

Plaintiff first complained of left flank pain on October 3, 2002. See Exhibit "A", Affidavit of Sisar Paderes, M.D., ("Paderes Aff.") ¶ 7. He was examined at the HCF medical unit that day and scheduled to return to the clinic for further evaluation. Id.

On October 4, 2002, Plaintiff returned to the medical unit. Paderes Aff. ¶ 8. Plaintiff was diagnosed with hematuria. Id. It was also noted that Plaintiff had kidney stones in the past. Id. Plaintiff was scheduled to have a kidney/abdominal ultrasound to look for kidney stones, with the possibility of seeing an urologist, if needed. Id.

On October 10, 2002, an intra-departmental committee of physicians--the Specialized Utilization Review Panel (SURP)--approved Plaintiff for an IVP (intravenous pyelogram, or kidney x-rays using intravenous contrast dye). Paderes Aff. ¶ 9.

**On October 10, 2002, Dr. Paderes signed a consultation record acknowledging the request for Plaintiff's IVP.** Paderes Aff. ¶ 10.

On October 15, 2002, Plaintiff was admitted to the infirmary for IVP bowel prep. Paderes Aff. ¶ 11. He was given magnesium citrate with instructions to drink water and verbalized an understanding thereof. Id. Plaintiff expressed that

he wanted to return to his module. Id. He was allowed to do so after being instructed further about the IVP prep procedure, and that the procedure would take place on October 17, 2002. Id.

On October 16, 2002, at 5:00 a.m., Plaintiff was seen in his cell by a medical staff member. Paderes Aff. ¶ 12. At 8:00 a.m., Plaintiff made a visit to the medical unit and asked for his medications. Id. He was sent back to his module after being instructed that he was not to eat solid food but only broth. Id.

On October 17, 2003, Plaintiff underwent a CT scan of the abdomen with renal stone protocol. Paderes Aff. ¶ 13. The CT scan revealed a large left urethral obstruction with bilateral renal calculi. Id.

**On October 18, 2002, Dr. Paderes prepared a consultation record noting the results of Plaintiff's October 17, 2002 CT scan, and requesting that Plaintiff be further evaluated by Dr. Kuchenbecker, an urologist. Paderes Aff. ¶ 14. Plaintiff's appointment with Dr. Kuchenbecker was scheduled for October 28, 2002. Id.**

On October 28, 2002, Plaintiff was examined by Dr. Kuchenbecker. Paderes Aff. ¶ 15. Dr. Kuchenbecker recommended Plaintiff undergo an ureteroscopy and lithotripsy. Id. He also recommended future treatment for the removal of renal calculi. Id.

198979_1.DOC                                    4

On October 31, 2002, the SURP committee approved Dr. Kuchenbecker's recommendations for surgery. Paderes Aff. ¶ 16.

On November 1, 2002, Plaintiff requested medical recreation. Paderes Aff. ¶ 17. Plaintiff was informed that he had been approved for lithotripsy and urology, but the treatment had not been scheduled yet. Id. Plaintiff's request for medical recreation was denied. Id.

On November 7, 2002, Plaintiff underwent a cystoureteroscopy, laser lithotripsy, retrograde pyelogram, and placement of double J stent to the left ureter (1st surgery by Dr. Kuchenbecker). Paderes Aff. ¶ 18. No surgery was performed on Plaintiff's right ureter at that time. Id. Plaintiff tolerated the procedure well. Id. Plaintiff was scheduled for a follow-up appointment with Dr. Kuchenbecker on November 13, 2002. Id.

On November 13, 2002, Plaintiff was examined by Dr. Kuchenbecker and his stent was removed. Paderes Aff. ¶ 19. Three remaining renal calculi were noted during that visit. Id. Plans were made to remove the stones in the future. Id.

**On November 14, 2002, Dr. Paderes reviewed the consultation notes of Plaintiff's November 13, 2002 examination by Dr. Kuchenbecker, and agreed with Dr. Kuchenbecker's recommendation for further treatment of Plaintiff's kidney condition. Paderes Aff. ¶ 20.**

On December 17, 2002, Plaintiff complained of bilateral flank pain and intermittent blood in his urine. Paderes Aff. ¶ 21. He was given Advil 200 mg, with instructions. Id. Plaintiff was scheduled to return to the medical unit for further evaluation on December 19, 2002. Id.

**On December 19, 2002, Dr. Paderes examined Plaintiff. Paderes Aff. ¶ 22. Kidney stones were noted. Id. Plaintiff complained of right flank pain. Id. Plaintiff was given Motrin 600 mg, with instructions. Id.**

On January 18, 2003, Plaintiff was seen by Dr. Young at the HCF medical unit. Paderes Aff. ¶ 23. Plaintiff complained of bilateral flank pain, blood in his urine, and passing kidney stones. Id. Dr. Young recommended further follow up with a urology consultation. Id. He prescribed Motrin, 800 mg for 90 days. Id. Plaintiff was given a strainer to collect kidney stone samples for analysis, and advised to drink plenty of fluids. Id. Plaintiff was scheduled to return to clinic in one month. Id.

On January 24, 2003, Dr. Young requested a spiral CT scan with contrast to look for additional kidney stones. Paderes Aff. ¶ 24. Plaintiff was scheduled for an appointment with Dr. Kuchenbecker on January 29, 2003. Id. The SURP committee approved Dr. Young's referral for an urological consultation with Dr. Kuchenbecker. Id.

On January 29, 2003, a spiral CT scan with stone protocol was performed. Paderes Aff. ¶ 25. The CT scan showed the presence of multiple stones in the right ureter, and multiple bilateral stones in the collection system. Id.

On January 30, 2003, Plaintiff was examined by Dr. Bauman, who requested that Plaintiff be referred for further urological evaluation. Paderes Aff. ¶ 26.

On February 6, 2003, Plaintiff underwent a cystoureteroscopy with laser lithotripsy, retrograde pyelograms with fluoroscopic imaging and placement of double J stent (2nd surgery by Dr. Kuchenbecker). Paderes Aff. ¶ 27.

**On February 6, 2003, Dr. Paderes reviewed Plaintiff's chart and scheduled him to be examined by the chronic care clinic for routine follow-up of his kidney condition. Paderes Aff. ¶ 28.**

Plaintiff was scheduled for a follow-up visit with Dr. Kuchenbecker on February 18, 2003, for stent removal. Paderes Aff. ¶ 29. The appointment with Dr. Kuchenbecker was later rescheduled to February 26, 2003. Id.

On February 26, 2003, Plaintiff was seen by Dr. Kuchenbecker for a cystoscopy and stent removal. Paderes Aff. ¶ 30. He was prescribed medication to dissolve the remaining stones chemically, with plans to follow-up with a CT scan in three months. Id.

**On March 20, 2003, Dr. Paderes examined Plaintiff. Paderes Aff. ¶ 31. He complained of right flank pain and dysuria. Id. Plaintiff was diagnosed**

kidney stones. <u>Id.</u> Dr. Paderes prescribed Vicodin for pain management. <u>Id.</u> He also referred Plaintiff for further evaluation by Dr. Kuchenbecker due to his continued complaints of kidney pain. <u>Id.</u>

On April 30, 2003, the follow-up CT scan was performed. Paderes Aff. ¶ 32. It demonstrated three renal calculi in the right lower pole. <u>Id.</u> There was no evidence of obstruction. <u>Id.</u> There were also two small ureteral calculi and several left renal calculi. <u>Id.</u> Dr. Paderes spoke with Dr. Hamasaki, a radiologist, regarding the results of CT scan performed that day, and referred him to Dr. Kuchenbecker for further discussion. <u>Id.</u>

On May 26, 2003, Plaintiff complained of blood in his urine and bilateral flank pain. Paderes Aff. ¶ 33. He was prescribed Advil. <u>Id.</u>

On May 27, 2003, Plaintiff was scheduled for clinic to see a doctor. Paderes Aff. ¶ 34.

On May 28, 2003, Plaintiff was examined by Dr. Bauman, who requested further urological evaluation with Dr. Kuchenbecker. Paderes Aff. ¶ 35. An appointment with Dr. Kuchenbecker was scheduled for July 25, 2003. <u>Id.</u>

On June 13, 2003, Dr. Paderes examined Plaintiff for complaint of right kidney pain. Paderes Aff. ¶ 36. His urinalysis results were consistent with kidney stones. <u>Id.</u> Dr. Paderes prescribed Vicodin and referred Plaintiff for a follow-up examination with Dr. Kuchenbecker in July 2003. <u>Id.</u>

On July 29, 2003, Plaintiff was examined by Dr. Kuchenbecker. Paderes Aff. ¶ 37. Dr. Kuchenbecker's consultation recommending left extracorporeal shock wave lithotripsy was received by the HCF medical unit for MD review the same day. Id.

On July 30, 2003, Plaintiff underwent EWSL (extracorporeal shock wave lithotripsy) of the left kidney (3rd and last surgery by Dr. Kuchenbecker). Paderes Aff. ¶ 38.

The issue before the Court is whether Dr. Paderes was deliberately indifferent to Plaintiff's medical needs.

II.   STANDARD OF REVIEW

Summary Judgment, Rule 56(c)

Summary Judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FRCP 56(c). The moving party has the burden of establishing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The plain language of Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's

case, on which that party will bear the burden of proof at trial. Celotex Corp., 477 U.S. at 323.

> If the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on the file that it believes demonstrate the absence of any genuine issue of material fact, the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment.

T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citations omitted).

FRCP Rule 56(c) requires the nonmoving party to set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." Bator v. Sate of Hawai'i, 39 F.3d 1021, 1026 (9th Cir. 1994) (citing T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 629-30 (9th Cir. 1987). The nonmoving party must produce at least some "significant probative evidence tending to support the complaint." T.W. Elec. Serv., Inc., 809 F.2d at 630 (quoting First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 290 (1968)); Barnett v. Centoni, 31 F.3d 813, 815 (9th Cir. 1994) (citations omitted). Legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment. British Airways Bd. v. Boeing Co., 585 F.2d 946, 952 (9th Cir.), cert. denied, 440 U.S. 981 (1979); Legal Aid Society of Hawai'i v. Legal Services Corp., 981 F.Supp. 1288, 1291 (D.Haw. 1997).

The Ninth Circuit has established that "[n]o longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." California Architectural Bldg. Products, Inc. v. Fransican Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987), cert. denied, 484 U.S. 1006 (1988); Legal Aid Society of Hawai'i, 981 F.Supp. at 1291. Moreover, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citations omitted). Indeed, "if the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." California Architectural Bldg. Products, Inc., 818 F.2d at 1468 (9th Cir. 1987) (emphasis in original) (citing Matsushita Elec. Indus. Co., Ltd., 474 U.S. at 587).

III.  ARGUMENT

Dr. Paderes Was Not Deliberately Indifferent To Plaintiff's Medical Needs And, Therefore, Dr. Paderes Is Entitled To Judgment As A Matter Of Law

The Eighth Amendment to the United States Constitution imposes an obligation on prison officials to provide for the basic human needs of prison inmates. Farmer v. Brennan, 511 U.S. 825, 832 (1994). Prison officials must provide prisoners with food, clothing, shelter, sanitation, medical care, and

personal safety. Rhodes v. Chapman, 452 U.S. 337, 347 (1981); Toussaint v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1986); Hoptowit v. Ray, 682 F.2d 1237, 1246 (9th Cir. 1982).

Deliberate indifference to a prisoner's serious illness or injury states a cause of action under 42 U.S.C. § 1983. Estelle v. Gamble, 429 U.S. 97, 105 (1976). In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. Id. at 106. Deliberate indifference may be manifested when prison officials deny, delay or intentionally interfere with medical treatment, or the manner in which prison physicians provide medical care. McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). Mere negligence related to medical treatment does not violate the Eighth Amendment, nor does a delay in performing surgery, unless the delay was harmful. Id. at 1059-60. (citations omitted). The defendant must "purposefully ignore or fail to respond" to a prisoner's pain or possible medical need; an accident or failure to provide care is insufficient. McGuckin, 974 F.2d at 1060 (9th Cir. 1992). Even gross negligence is insufficient to establish deliberate indifference to serious medical needs. Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990).

The Court explicitly held in Estelle that not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment. Estelle, 429 U.S. at 105. The Ninth Circuit has adopted this rationale in a series of cases since Estelle. Wood, 900 F.2d 1332, 1334 ("[W]e scrutinize the particular facts and look for substantial indifference in the individual case, indicating more than mere negligence or isolated occurrences of neglect"); Hutchinson v. U.S., 838 F.2d 390, 394 (9th Cir. 1988) ("Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights"); Franklin v. State of Oregon, State Welfare Div., 662 F.2d 1337, 1344 (9th Cir. 1981) ("A difference of opinion between prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim").

Deliberate indifference is a high legal standard. Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004). Under this standard, the prison official must not only "be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists," but that person must also draw the inference. Id. (quoting Farmer, 511 U.S. at 837).

Plaintiff's allegations against Dr. Paderes are insufficient to give rise to a claim for relief under § 1983 for violation of the Eighth Amendment. A review of Plaintiff's medical history at the HCF shows that Dr. Paderes provided appropriate

and timely medical treatment that met the standard of care.  See Exhibit "B", Affidavit of Herbert K.W. Chinn, M.D. ("Chinn Aff.") and attached Exhibit "B-1", Report of Herbert K.W. Chinn, M.D., dated July 17, 2006 ("Chinn Report").

Dr. Paderes first became involved in Plaintiff's medical care on October 10, 2002 by signing a consultation record acknowledging the request for Plaintiff's IVP procedure.  Paderes Aff. ¶ 10.  October 18, 2002, Dr. Paderes noted the results of Plaintiff's October 17, 2002 CT scan, and requested further urological evaluation by Dr. Kuchenbecker.  Id. ¶ 14.  Plaintiff attended his first appointment with Dr. Kuchenbecker on October 28, 2002.  Id. ¶ 15.

From the time Dr. Paderes entered Plaintiff's case (October 10, 2002) until Plaintiff first visited with Dr. Kuchenbecker (October 28, 2002), a period of 18 days elapsed.  Excluding his appointment with Dr. Kuchenbecker, there were three separate occasions during that period during which Plaintiff either was seen at the medical clinic or received outside medical treatment for his kidney condition.  Paderes Aff. ¶¶ 11, 12, and 13.

Plaintiff underwent the first of three surgeries by Dr. Kuchenbecker on November 7, 2002.  Paderes Aff. ¶ 18.  Dr. Paderes' next involvement was on November 14, 2002, when he reviewed the consultation notes of Plaintiff's November 13, 2002 appointment with Dr. Kuchenbecker, and agreed with Dr.

Kuchenbecker's recommendation for further treatment of Plaintiff. Paderes Aff. ¶ 20.

Just over one month elapsed between Plaintiff's first complaint of flank pain (October 3, 2002) and his first surgery (November 7, 2002), during which time Plaintiff received direct care on six occasions in response to complaints about his kidney condition. Paderes Aff. ¶¶ 8, 11, 12, 13, 15, and 17. Furthermore, during that period, Plaintiff's medical chart was reviewed another four times by the medical staff at the HCF--twice by Dr. Paderes--for approval of his urological medical care. Id. ¶¶ 9, 10, 14, and 16.

On December 17, 2002, approximately one and a half months after Plaintiff's first surgery, he complained of bilateral flank pain and blood in his urine. Paderes Aff. ¶ 21. Two days later, on December 19, 2002, Dr. Paderes examined Plaintiff, and prescribed Motrin for pain management. Id. ¶ 22. On January 29, 2003, Plaintiff underwent further urological evaluation, including a spiral CT scan to look for additional kidney stones. Id. ¶ 25. On February 26, 2003, less than one month after seeing Dr. Paderes (December 19, 2002), Plaintiff underwent a second surgery for removal of kidney stones. Id. ¶ 27.

On February 6, 2006, Dr. Paderes reviewed Plaintiff's medical chart and scheduled him for chronic care clinic for routine follow-up of his kidney condition. Paderes Aff. ¶ 28.

Dr. Paderes examined Plaintiff again on March 20, 2003, for complaints of flank pain and dysuria. Paderes Aff. ¶ 31. Dr. Paderes prescribed Vicodin for pain management, and referred Plaintiff to Dr. Kuchenbecker for further evaluation. Id.

On April 30, 2002, Dr. Paderes contacted Dr. Hamasaki, a radiologist, regarding the results of the CT scan performed that day, and referred him to Dr. Kuchenbecker for further discussion. Id.

Plaintiff was seen at the medical clinic on May 26 and 28, 2003 for complaint of pain and other symptoms associated with his kidney condition, and was scheduled to see Dr. Kuchenbecker on July 25, 2002. Paderes Aff. ¶¶ 33-34. In the meanwhile, on June 13, 2002, Dr. Paderes examined Plaintiff and referred him for a follow-up examination with Dr. Kuchenbecker in July 2003. Paderes Aff. ¶ 36.

Dr. Kuchenbecker was unable to examine Plaintiff until July 29, 2003. Paderes Aff. ¶ 37. The next day, July 30, 2003, Plaintiff underwent his third and final surgery by Dr. Kuchenbecker. Id. ¶ 38.

As shown above, Plaintiff's allegations of untimely medical treatment by Dr. Paderes are without support in the record. Plaintiff has failed to demonstrate any acts or omissions sufficient to establish that Dr. Paderes was deliberately indifferent to his medical needs. Any alleged delay in medical treatment was not due to Dr. Paderes, but, arguably, the constraints of the prison system that required

198979_1.DOC                              16

approval of Plaintiff's urologic evaluation and treatment by Dr. Kuchenbecker, a medical specialist.

Indeed, Dr. Paderes delivered prompt medical attention that met the standard of care. See Chinn Report (Exhibit "B-1" attached to Chinn Aff.). Such medical care consisted of examining Plaintiff, prescribing medication for pain management, and recommending further urological evaluation, which included certain diagnostic examinations and surgery.

Plaintiff has failed to present any evidence that Dr. Paderes purposefully ignored or failed to respond to Plaintiff's medical needs. See McGuckin, 974 F.2d at 1059-60. Likewise, Plaintiff has failed to present any evidence that shows Dr. Paderes denied, delayed, or intentionally interfered with Plaintiff's medical treatment. Id. Finally, assuming a delay in surgery, Plaintiff has failed to demonstrate that such denial resulted in any harm to him. Id. at 1060 (citation omitted).

## IV.   CONCLUSION

The undisputed material facts show that Dr. Paderes was not deliberately indifferent to Plaintiff's medical needs. Therefore, Dr. Paderes is entitled to summary judgment as a matter of law, and he respectfully requests that judgment be entered in his favor.

DATED: Honolulu, Hawai'i, August 2, 2006.

        STATE OF HAWAI'I

        MARK J. BENNETT
        Attorney General
        State of Hawai'i

        _____
        MIRIAM P. LOUI
        Deputy Attorney General

        _____
        CARON M. INAGAKI
        Deputy Attorney General

        Attorneys for Defendant
        SISAR PADERES, M.D