CM/ECF-DC V2.5 (11/05) **LIVE**                    https://ecf.hid.circ9.dcn/cgi-bin/Dispatch.pl?118089861541461

# Orders on Motions

### 1:03-cv-00171-HG-KSC Aholelei v. Kyser, et al

**U.S. District Court**

**District of Hawaii - CM/ECF V2.5 (11/05)**

Notice of Electronic Filing

The following transaction was received from afc, entered on 9/25/2006 at 12:09 PM HST and filed on 9/25/2006

**Case Name:**    Aholelei v. Kyser, et al
**Case Number:**    1:03-cv-171
**Filer:**
**Document Number:** 86

**Docket Text:**
ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT [65], [69] - Signed by Judge HELEN GILLMOR on 9/21/06. (afc)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1095854936 [Date=9/25/2006] [FileNumber=156325-0]
[8cc773dfeb5dfb0c36108a0aa025203fe884d36713fe6cad42c92f947d70b6e77f7e
e45f8c81c3be192ed26d3cb0f26c32f959f0b0123842ead06267c280c862]]

**1:03-cv-171 Notice will be electronically mailed to:**

April Luria    aluria@rlhlaw.com, shull@rlhlaw.com

**1:03-cv-171 Notice will be delivered by other means to:**

William S. Aholelei
A0146949
Oahu Community Correctional Center
2199 Kamehameha Hwy.
Honolulu, HI 96819-2307

Caron M. Inagaki
Attorney General of Hawaii
Dept of the Attorney General, State of HI
425 Queen Street
Honolulu, HI 96813

Cindy S. Inouye
Office of the Attorney General-Hawaii
425 Queen St
Honolulu, HI 96813

Miriam P. Loui
Attorney General of Hawaii
Dept of the Attorney General,State of HI
425 Queen Street
Honolulu, HI 96813

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| WILLIAM S. AHOLELEI,<br><br>        Plaintiff,<br><br>    vs.<br><br>BARBARA KYSAR, DOCTOR S.<br>PADERES, DOCTOR BAUMAN, DOES<br>I-V,<br><br>        Defendants. | CIVIL NO. 03-00171 HG-KSC<br><br>ORDER GRANTING DEFENDANTS'<br>MOTIONS FOR SUMMARY JUDGMENT |

## ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Before the Court is Defendants' Sisar Paderes, M.D., and Kay Bauman, M.D. Motions for Summary Judgment ("Defendants' Motions"). The Court finds this matter suitable for disposition without a hearing pursuant to Local Rule 7.2(d) of the Local Rules of Practice of the United States District Court for the District of Hawaii. After careful consideration of Defendants' Motions, Aholelei's Oppositions, and Defendants' Replies, the Court grants Defendants' Motions.

### PROCEDURAL BACKGROUND

Aholelei filed this prisoner civil rights suit on April 14, 2003. (Docket No. 1.) Aholelei initially named as defendants Barbara Kysar, Hawaii Governor Linda Lingle, and Halawa Correctional Facility's ("Halawa") Ex-Warden, Nolan Espinda. The Court dismissed Lingle and Espinda on September 11, 2003. (Docket No. 16.)

On September 22, 2003, Aholelei filed an Amended Complaint, adding Dr. Paderes and Dr. Bauman as defendants, naming them in their individual capacities only.  (Docket No. 18.)

On January 21, 2004, Defendants filed a Notice of Suggestion of Death concerning Kysar, and amended on January 30, 2004. (Docket Nos. 22 & 23.)  On May 13, 2004, the Court dismissed Kysar from this action. (Docket No. 35.)

On September 13, 2004, the court stayed these proceedings until April 11, 2006, while Dr. Paderes was deployed to Iraq. (Docket No. 47.)  On November 8, 2005, Dr. Paderes's attorney informed the court that Dr. Paderes was expected to return to civilian status on or about March 16, 2006.[1]  (Docket No. 58.)

On July 31, 2006, Dr. Bauman filed her Motion for Summary Judgment.  (Docket No. 65.)  Dr. Bauman argues that she is immune from suit for damages in her official capacity under the Eleventh Amendment.  She also argues that she has not violated Aholelei's constitutional rights, and that, even if constitutional violations could be established, she is entitled to qualified immunity as to Aholelei's claims against her.

Dr. Paderes filed his Motion for Summary Judgment on August 2, 2006.  (Docket No. 69.)  Dr. Paderes argues that he was not deliberately indifferent to Aholelei's medical needs as a matter

---

[1]Dr. Paderes actually returned to civilian status on February 13, 2006.  (Paderes Reply, Aff. ¶ 3.)

of law.  Dr. Paderes has also filed a statement of no opposition
to Dr. Bauman's Motion for Summary Judgment.  (Docket No. 72.)

Aholelei filed his Oppositions to Paderes's and Bauman's
Motions for Summary Judgment on August 7 and 30, 2006.  (Docket
Nos. 75 & 80.)

Defendants filed their Replies on August 29 and 31, 2006.
(Docket Nos. 78 & 82.)

On September 12, 2006, the Court vacated the scheduled
hearing in this proceeding and took the matter under advisement.
(Docket No. 83.)

## FACTS

According to Aholelei's medical records, he is a middle-aged
man with a "long history of recurring renal and ureteral
calculi," which are better known in layman's terms, as kidney
stones.[2] (Aholelei's Obj. to Paderes Mtn. Ex. A-2.)  Kidney
stones are considered one of the most painful of the urologic
disorders, as well as being one of the most common disorders of
the urinary tract.  See http://kidney.niddk.nih.gov.  Aholelei's
pre-existing, recurring kidney stone condition caused him
intermittent pain, and the treatment he received for that

---

[2] A kidney stone is a hard mass developed from crystals that
separate from the urine and build up on the inner surfaces of the
kidney. http://kidney.niddk.nih.gov.  Most kidney stones pass out
of the body without any intervention by a physician.  Id.
Stones that cause lasting symptoms or other complications may be
treated by various techniques. Id.

condition, provides the basis for this suit.

Aholelei claims that Defendants acted with deliberate indifference to his serious medical needs when they allegedly provided inadequate care and treatment for his kidney stone condition while he was incarcerated at Halawa Correctional Facility ("Halawa").[3]

The uncontroverted facts before the court are as follows:

Dr. Paderes has been employed by the State of Hawaii, Department of Public Safety ("DPS"), since 1996. (Paderes Mot., Aff. ¶ 1.) During most of the time at issue here, Dr. Paderes was the primary inmate physician at Halawa.[4] (Paderes Aff. ¶ 5.) Dr. Bauman has been the DPS Medical Director since July 1, 2002. (Bauman Conc. Stmt., Aff. ¶¶ 2 & 3.)

On October 3, 2002, Aholelei first complained of pain in his left flank while at sick call. (Bauman Conc. Stmt., Exh. A, 506.) He was examined, given Tylenol, and scheduled for a clinic exam. (Bauman Conc. Stmt. Exh. A, 506.)

On October 4, 2002, Dr. Bauman examined Aholelei and

---

[3]Although Aholelei's Amended Complaint only alleges deliberate indifference while he was at Halawa, after he filed that Complaint he was transferred to two other Hawaii prisons, as detailed below, and in his Oppositions he alleges that Defendants continued to deny him adequate medical care at the these prisons.

[4]Dr. Paderes did not work at Halawa for the nineteen months between July 14, 2004, and February 12, 2006, while he was either fulfilling his military training, on vacation or leave, or on active military duty in Iraq. (Paderes Reply, Aff. ¶ 3.)

thereupon requested an ultrasound and a urology consult to determine if kidney stones were present. (Bauman Conc. Stmt., Exh. A, 506-507.) In the record of this visit, Dr. Bauman noted that Aholelei had experienced kidney stones in the past. (Bauman Conc. Stmt., Exh. A, 506.)

On October 10, 2002, the Specialized Utilization Review Panel ("SURP"), an intra-departmental committee of physicians utilized by the DPS to determine when an inmate needs outside medical care or surgery, approved Aholelei for an intravenous pyelogram ("IVP").[5] (Bauman Conc. Stmt. Exh. A, 507.) Dr. Paderes signed a consultation record acknowledging the IVP request on the same date. (Paderes Mot., Aff. ¶ 10.)

On October 15, 2002, Aholelei was admitted to the HCF infirmary for IVP bowel prep. (Paderes Mot., Aff. ¶ 11.) Aholelei requested to return to his module, which was allowed after he was given further instructions about the IVP preparation procedure and informed that the procedure would take place on October 17, 2002. (Paderes Mot., Aff. ¶ 11.)

On October 16, 2002, Aholelei was seen at his cell by a medical staff member, and he also visited the infirmary to ask for his medications. (Paderes Mot., Aff. ¶ 12.) He was again instructed to refrain from solid food until after his IVP

---

[5]An intravenous pyelogram is an x-ray of the kidneys using intravenous contrast dye. (Paderes Aff. ¶ 9.)

procedure the next day.

Aholelei had the CT scan (IVP procedure) the next day, October 17, 2002. (Bauman Conc. Stmt., Exh. A, 641.) The CT scan revealed a left urethral obstruction calculus and bilateral renal calculi (kidney stones). (Bauman Conc. Stmt., Exh. A, 641.)

On October 18, 2002, Dr. Paderes prepared a consultation record noting the results of the October 17, 2006 CT scan. (Paderes Mot., Aff. ¶ 14.) Dr. Paderes also requested that Aholelei be evaluated by an outside urologist, David Kuchenbecker, M.D. (Paderes Mot., Aff. ¶ 14.) The medical unit scheduled an appointment with Dr. Kuchenbecker for October 28, 2002. (Bauman Conc. Stmt., Exh. A, 638.)

On October 28, 2002, Dr. Kuchenbecker examined Aholelei and recommended that he undergo a ureteroscopy[6] and lithotripsy,[7] and

---

[6]Ureteroscopy utilizes a ureteroscope to visualize the inside of the ureter, enabling a doctor to see the kidney stone. The doctor can then move the stone, either by removing it with a small basket at the end of a wire inserted through an extra tube in the ureteroscope or by extending a flexible fiber that carries a laser beam to break the stone into smaller pieces that can then pass out of the body in the urine. How and what the doctor will do is determined by the location, size, and composition of the stone. The doctor may leave a stent, a flexible tube that keeps the ureter open for drainage after the procedure. See http://www.kidney.niddk.nih.gov. Although some kidney stones in the ureters can be treated with extracorporeal shockwave lithotripsy, ("ESWL"), ureteroscopy is often indicated for mid- and lower-ureter stones. Id.

[7]Lithotripsy is a technique that uses shock waves to break up stones that form in the kidney, bladder, ureters, or

that another ultrasound be conducted in the future. (Bauman

Conc. Stmt., Exh. A, 638.)  Dr. Kuchenbecker also recommended

future treatment for the removal of renal calculi. (Paderes

Mot., Aff. ¶ 13.)  The SURP committee approved Dr. Kuchenbecker's

recommendations on October 31, 2002. (Bauman Conc. Stmt., Exh.

A, 641, Paderes Mot. Exh. C-1, 502.)

On November 7, 2002, Aholelei underwent his first procedure

to break down and treat his kidney stones. Dr. Kuchenbecker

performed a cystoureterscopy, laser lithotripsy, retrograde

pyelogram, and placed a stent in Aholelei's left ureter. (Bauman

Conc. Stmt., Exh. A, 629-30, Exh. B, 009-010.)  During the

procedure, Dr. Kuchenbecker found a "large upper ureteral

calculus" which he "sequentially laser fragmented into tiny

fragments." (Paderes Mot. Exh. C-1, 633-34.)  He then irrigated

several smaller stones from the ureter and sent them for

analysis. Dr. Kuchenbecker noted that Aholelei tolerated the

---

gallbladder. There are several ways of doing this, although the
most common is extracorporeal shock wave lithotripsy ("ESWL"),
however, lithotripsy is also commonly done using an internal
laser to break the stones. The shock waves are focused on the
kidney stone and break the stone into tiny sand-like pieces,
which are easily passed out of the body naturally during
urination. Throughout the procedure, the doctor can view what is
happening to the stones through x-ray or ultrasound monitoring.
This procedure prevents the patient from undergoing major surgery
to have the stones removed, which reduces discomfort,
complications, hospital stay, cost, and recovery time. See
http://www.nlm.nih.gov/medlineplus/ncy

procedure well and that there were no intra or perioperative complications. (Bauman Conc. Stmt., Exh. B, 010.)

Aholelei saw Dr. Kuchenbecker for a follow up examination on November 13, 2002. (Paderes Mot., Aff. ¶ 19.)  Dr. Kuchenbecker noted that Aholelei had three remaining renal calculi and made plans to remove these stones in the future. (Paderes Mot., Aff. ¶ 19.)  Dr. Paderes reviewed Dr. Kuchenbecker's consultation notes of Aholelei's November 13 examination and agreed with Dr. Kuchenbecker's recommendation for further treatment of Aholelei's kidney stone condition. (Paderes Mot., Aff. ¶ 20.)

Approximately one month later, on December 17, 2002, Aholelei went to the infirmary complaining of pain in his kidneys and was given Advil. (Paderes Mot., Exh. C-1, 500.)

Two days later, on December 19, 2002, Dr. Paderes examined Aholelei and noted "multiple" kidney stones. (Paderes Mot., Exh. C-1, 500.)  Dr. Paderes states that he gave Aholelei Motrin 600 mg. with instructions. (Paderes Mot., Aff. ¶ 22; Exh. C-1, 500.)

On January 18, 2003, Aholelei was seen by a Dr. Young at the Halawa infirmary, complaining of pain in his bilateral flank, blood in his urine, and passing kidney stones. (Bauman Conc. Stmt., Exh. A, 498.)  Dr. Young prescribed Motrin 800 mg. for ninety days, gave Aholelei a strainer to collect any passed kidney stones for analysis, and recommended further follow up with a urology consultation. (Bauman Conc. Stmt., Exh. A, 498.)

Dr. Young also advised Aholelei to drink plenty of fluids, and scheduled him to return to the clinic in one month. (Bauman Conc. Stmt., Exh. A, 498.)

Several days later, on January 24, 2003, Dr. Young requested a spiral CT scan with contrast (IVP) to determine if there were additional kidney stones. (Bauman Conc. Stmt., Exh. A, 624.) The SURP committee approved Dr. Young's referral for another urology consult with Dr. Kuchenbecker, and Aholelei had the second CT scan on January 29, 2003. (Paderes Aff. ¶¶ 24-25, Bauman Conc. Stmt., Exh. A, 624-26.)

On January 30, 2003, Dr. Bauman reviewed Aholelei's chart and requested another laser ureteroscopy for Aholelei. (Bauman Mot., Aff. ¶ 12.)

One week later, on February 6, 2003, Dr. Kuchenbecker performed a second procedure for Aholelei's remaining, left-side kidney stones. This involved laser cystoureteroscopy, retrograde pyelogram with fluoroscopic imaging, and placing a stent in Aholelei's left ureter. (Bauman Conc. Stmt., Exh. A, 965-66.) Dr. Kuchenbecker found "[a] total of four or five stones," which he laser fragmented into tiny fragments. (Paderes Mot., Exh. C-1, 965.) Dr. Kuchenbecker stated that "[n]o significant size fragments were evident" at the procedure's conclusion, and that Aholelei tolerated the procedure well, with no intra or perioperative complications. (Paderes Mot., Exh. C-1, 965-66.)

Dr. Paderes reviewed Aholelei's chart that same day and scheduled him for an examination at Halawa's chronic care clinic for a routine follow-up. (Paderes Mot., Aff. ¶ 28; Exh. C-1, 496.)

Although Aholelei was seen at the Halawa infirmary on February 18, 2003, he did not complain of kidney pain at this visit. (Paderes Mot., Exh. C-1, 496-97.)

On February 26, 2003, Dr. Kuchenbecker examined Aholelei, removed the stent, prescribed medicines to dissolve the remaining stones, and informed him that there should be a follow-up CT scan in three months. (Paderes Mot., Aff. ¶ 30; Bauman Conc. Stmt., Exh. A, 618.)

On March 7, 2003, Aholelei went to the Halawa infirmary complaining of back pain, mid-abdominal pain, and sinus problems. (Paderes Mot., Exh. C-1, 497.) Aholelei also requested a urology follow up. (Paderes Mot., Exh. C-1, 497.)

On March 20, 2003, Dr. Paderes examined Aholelei, who was complaining of right flank pain and dysuria. (Paderes Mot., Exh. C-1, 494.) Dr. Paderes diagnosed kidney stones, and prescribed Vicodin for pain management. (Paderes Mot., Exh. C-1, 494.) Dr. Paderes referred Aholelei to Dr. Kuchenbecker again. (Paderes Mot., Exh. C-1, 494) ("Inform Dr. Kuchenbecker of pt's continuance of kidney pain despite ↓ in stone excretion.")

On April 2, 2003, Dr. Bauman responded to a grievance

-10-

Aholelei had filed concerning the medical care he was receiving.
Dr. Bauman acknowledged Aholelei's painful condition and stated:

> This has been a painful and serious problem
> for you. We are following Dr. Kuchenbecker's
> recommendations. You have received both
> medications that he recommended to decrease
> your chance of making more stones. He plans
> to see you back in 3 months (from 2/26/03)
> with a repeat CT prior to that visit to check
> on the status of the stones. If he sees no
> resolution of the problem, he will then
> schedule you for lithotripsy.

(Bauman Conc. Stmt., Exh. A, 477A.)

On April 14, 2003, Aholelei filed the Original Complaint in
this action, alleging that Defendants were denying and delaying
him medical care for his kidney stones. (See Docket No. 1, Orig.
Compl.)

On April 24, 2003, Aholelei went to the Halawa infirmary
complaining of boils on his leg, was treated, and given
medication. (Paderes Mot., Exh. C-1, 495.) He did not complain
of kidney pain at this visit.

On April 30, 2003, another CT scan was done on Aholelei's
kidneys per Dr. Paderes's request. (Paderes Mot., Exh. C-1,
Docket No. 69, p. 31 of 40.)[8] Dr. Paderes spoke with Dr.
Hamasaki, a radiologist, regarding this CT scan, and referred Dr.
Hamasaki to Dr. Kuchenbecker for further discussion. (Paderes

---

[8]The Court cannot determine the page number for this
exhibit, however it is electronically labeled as page 31 of 40 in
Docket No. 69.)

-11-

Mot., Exh. C-1, 495.)

On May 17, 2003, Aholelei reported to Halawa infirmary complaining of sinus problems. (Paderes Mot., Exh. C-1, Docket No. 69, 15 of 40.)[9]  There is no mention of kidney pain in the notes for this visit.

On May 26, 2003, Aholelei complained that he was passing blood in his urine.  (Paderes Mot., Exh. C-1, Docket No. 69, 15 of 40.)  Aholelei's clinical chart notes that he was calm, was told to increase his fluid intake, and to continue straining his urine.  (Paderes Mot., Exh. C-1, Docket No. 69, 15 of 40.)  He was given Advil, and the chart notes that he would be scheduled for chronic care for his kidney pain.  (Paderes Mot., Exh. C-1, Docket No. 69, 15 of 40.)

On May 27, 2003, Dr. Bauman saw Aholelei at chronic care. (Bauman Conc. Stmt., Exh. A, 538-39.)  The next day, May 28, 2003, Dr. Bauman requested the three-month follow-up visit with Dr. Kuchenbecker.  (Bauman Conc. Stmt., Exh. A, 937.)  An appointment could not be scheduled with Dr. Kuchenbecker, however, until July 29, 2003.  (Bauman Mot., Aff. ¶ 16.)

On June 13, 2003, Dr. Paderes examined Aholelei, who complained of right kidney pain. (Paderes Mot., Exh. C-1, Docket No. 69, 16 of 40.)  Dr. Paderes prescribed Vicodin for Aholelei's

---

[9]The Court cannot determine the page number for this exhibit, however it is electronically labeled as page 15 of 40 in Docket No. 69.)

pain, and referred him to Dr. Kuchenbecker. (Paderes Mot., Exh. C-1, Docket No. 69, 16 of 40.)

On July 28, 2006, Magistrate Judge Kevin S.C. Chang issued a Findings and Recommendation to Grant Defendants' Motion to Dismiss Complaint. (Docket No. 14.) This Court adopted the Findings and Recommendation over Aholelei's Objection on September 11, 2003. (Docket No. 16.)

Dr. Kuchenbecker saw Aholelei on July 29, 2003. (Paderes Mot., Exh. C-1, Docket No. 69, 17 of 40.) The next day, July 30, 2003, Dr. Kuchenbecker performed a third procedure to treat Aholelei's left-side kidney stones, utilizing extracorporeal shockwave lithotripsy ("ESWL") with fluoroscopic localization on Aholelei's left ureter. (Paderes Mot., Exh. D-1, 017.) Dr. Kuchenbecker discovered a "4x5 mm calculi" in Aholelei's lower left calix, to which he administered "[a] total of 5000 shocks." (Paderes Mot., Exh. D-1, 017.) Aholelei tolerated the procedure well, and there were no intra or perioperative complications.

On August 27, 2003, Dr. Paderes evaluated Aholelei at the Halawa medical clinic for complaints of flank pain. (Paderes Reply, Aff. ¶ 9.) Dr. Paderes recommended continued treatment of Aholelei's kidney stones with Allopurinal, monitoring of his urologic condition, and reevaluation at the clinic in thirty days. (Paderes Reply, Aff. ¶ 9.)

On September 22, 2006, Aholelei filed his Amended Complaint.

-13-

(Docket No. 18.)  In the Amended Complaint, Aholelei named Dr.

Paderes and Dr. Bauman in their individual capacities, and Doe

Defendants I-V.  He has never moved to name any Doe Defendant.

The Amended Complaint realleges Aholelei's claims that Dr. Bauman

and Dr. Paderes delayed or denied him adequate medical care for

his kidney stone condition.  The Amended Complaint also alleges

that, when Dr. Kuchenbecker performed the third procedure on

Aholelei's left-side kidney stones in July 2003, he informed

Aholelei that a similar procedure would be done in one month on

Aholelei's right-side kidney stones.  The Amended Complaint also

alleges that Aholelei was "still having tremendous kidney pains

and fearing for [his] life."  (Amd. Compl. at 6.)  In his

Oppositions, filed in August 2006, Aholelei states that he has

not seen Dr. Kuchenbecker since the July 30, 2003 procedure, and

that he is still in pain.[10]

On October 3, 3003, Aholelei was assaulted by other inmates

and hospitalized.  (Paderes Reply, Aff. ¶ 11.)

When Aholelei returned to Halawa, on October 16, 2003, he

remained at the Halawa infirmary until December 3, 2003,

recuperating.  (Paderes Reply, Aff. ¶ 12.)  Aholelei complained

of kidney pain twice while at the infirmary, on November 11 and

19, 2003, and was given Motrin for his pain.  (Paderes Reply,

---

[10] Notwithstanding Aholelei's allegation, the record shows
that he saw Dr. Kuchenbecker on July 23, 2004.  (Paderes Reply,
Aff. ¶¶ 25 & 26, 7/23/04 Consultation Record.)

Aff. ¶ 12.)  Aholelei reported that he was feeling better after
taking the Motrin.  (Bauman Reply, Exh. AA, 859.)

After Aholelei was discharged from the Halawa infirmary, he
was seen by an outside ophthalmologist, Dr. Kubo, for visual
disturbances, and by Dr. Patel for psychiatric complaints.
(Bauman Reply, Aff. ¶ 4.)

On January 13, 2004, Dr. Paderes examined Aholelei at the
Halawa clinic for back pain and weight loss.  (Paderes Reply,
Aff. ¶ 13.)  He did not complain of kidney pain at that time, and
was prescribed Motrin 800 mg. and Flexeril 10 mg. for his back
pain.  (Bauman Reply, Aff. ¶ 5.)  He was still taking Allopurinal
for kidney stone management.

On March 4, 2004, Aholelei reported to sick call for
breathing difficulties and anxiety.  (Bauman Reply, Aff. ¶ 5.)
He did not complain of kidney pain at this time.  (Bauman Reply,
Aff. ¶ 5.) He was seen again on March 12, 2004, but made no
complaints of kidney pain.  (Paderes Reply, Aff. ¶ 15.)

On April 6, 2004, Dr. Paderes reviewed Aholelei's medical
chart and requested a urology follow-up examination.  (Paderes
Reply, Aff. ¶ 16.)

On May 28, 2004, Aholelei had a regular check up for his
various medical conditions. (Paderes Reply, Aff. ¶ 17.) He
complained of blood in his urine at this visit.

On June 8, 2004, Dr. Paderes saw Aholelei at the medical

clinic and ordered a urinalysis, which was negative for blood in Aholelei's urine. (Paderes Reply, Aff. ¶¶ 18 & 19.)  At Dr. Paderes's request, a urology consult with Dr. Kuchenbecker was scheduled for July 9, 2004.  (Paderes Reply, Aff. ¶ 20.)

On June 24, 2004, Dr. Paderes requested a CT scan to determine if kidney stones were present.  (Paderes Reply, Aff. ¶ 21.)  Several days later, on June 29, 2004, Aholelei had a CT Urogram at Castle Medical Center, which revealed a non-obstructive 6 mm. stone in his lower right kidney.  (Paderes Reply, Aff. ¶ 22.)

On June 30, 2004, Dr. Kuchenbecker cancelled the July 9, 2004 appointment, stating that it was "not necessary." (Paderes Reply, Aff. ¶ 23.)

Dr. Paderes effectively ceased practicing at Halawa on July 14, 2004, and did not return until nineteen months later, on February 13, 2006.  (Paderes Reply, Aff. ¶ 3.)  Dr. Paderes has not personally examined or treated Aholelei since his return from Iraq, although he did review Aholelei's medical chart on July 31, 2006.  (Paderes Reply, Aff. ¶¶ 65 & 66.)

On July 23, 2004, Aholelei was seen at the Halawa medical clinic and by Dr. Kuchenbecker.  (Paderes Reply, Aff. ¶¶ 25 & 26.)  Dr. Kuchenbecker explained that Aholelei's remaining right kidney stone could not explain his left-side pain.  Although Aholelei was asymptomatic on the right side, Dr.

-16-

Kuchenbecker recommended extracorporeal shockwave lithotripsy ("ESWL") of the right-side stone.

Aholelei had a urinalysis on August 18, 2004, which was negative for blood in the urine. (Paderes Reply, Aff. ¶ 28.)

On September 7, 2004, Halawa physician Dr. Abbruzzese saw Aholelei for kidney pain and hematuria. (Paderes Reply, Aff. ¶ 29.) Dr. Abbruzzese noted that the renal calculi "should pass," a urinalysis was normal, and that Aholelei was "doing well." (Paderes Reply, Aff. ¶ 29.)

Aholelei did not complain of kidney pain again until December 3, 2004, when he went to the chronic care clinic. (Bauman Reply, Aff. ¶ 7.) Aholelei was taking Motrin.

On January 6, 2005, Aholelei's urinalysis was negative for blood in the urine. (Paderes Reply, Aff. ¶ 31.)

Aholelei was transferred to Waiawa Correctional Facility ("Waiawa") on January 28, 2005, and was seen at the Waiawa chronic care clinic on February 10, 2005. (Paderes Reply, Aff. ¶¶ 32-33.) His kidney stones were stable, there was no blood in his urine, and he was prescribed Flomax and sodium bicarbonate to decrease his urinary symptoms. (Paderes Reply, Aff. ¶ 33.)

On March 11, 2005, Aholelei went to the medical unit complaining of left lower back pain. They performed a urinalysis, which tested negative for blood. (Paderes Reply, Aff. ¶ 34.) Dr. Bauman also reviewed Aholelei's medical chart on

-17-

the same day, and noted a discussion re: new medicine that would reduce stone formation and increase excretion. (Paderes Reply, Aff. ¶ 35.)

On April 1, 2005, Dr. Bauman ordered an ultrasound of Aholelei's kidneys as a routine follow-up. (Bauman Reply, Aff. ¶ 8.)  The ultrasound was performed on April 8, 2005, and revealed a 9 mm. stone in Aholelei's right kidney, although there were no other calculi seen, no hydronephrosis, and normal flow from both ureters to the bladder. (Bauman Reply, Aff. ¶ 8.)

Dr. Bauman saw Aholelei at the chronic care clinic on April 29, 2005. (Paderes Reply, Aff. ¶ 38.)  Aholelei's medical chart notes the April 8 CT scan results and that Aholelei did not complain of kidney pain at this visit.

Dr. Bauman saw Aholelei at the chronic care clinic again on July 22, 2005. (Paderes Reply, Aff. ¶ 39; Exh. A, "7/22/05 Chronic Care Clinic Follow Up Visit.")  The medical chart states that Dr. Bauman sought a consultation with Dr. Kuchenbecker and it is marked "OK for ESL of remaining R stone[.]"[11]  (Paderes Reply, Aff. ¶ 39; Exh. A, "7/22/05 Chronic Care Clinic Follow Up Visit.")  The SURP committee approved the ESL, and an appointment with Dr. Kuchenbecker was scheduled for August 19, 2005.  (Bauman Reply, Aff. ¶ 9.)

---

[11] "ESL" indicates extracorporeal shockwave lithotripsy, also commonly called "ESWL."

-18-

On or about July 27, 2005, Dr. Kuchenbecker informed Halawa that he would no longer see Halawa patients. (Bauman Reply, Aff. ¶ 9.) Dr. Kuchenbecker advised that, as Aholelei's right kidney stone had increased from 6 mm. to 9 mm. since the last CT scan, he should undergo a "KUB."[12] Dr. Kuchenbecker suggested that a KUB would reveal the type of kidney stones Aholelei was producing and, thus, whether those stones could be reduced by taking sodium bicarbonate or Urocit-K, or whether another ESWL, this time for the right side, was required. (Bauman Reply, Aff. ¶ 9; Exh. AA, Kuchenbecker letter.)

A KUB was scheduled at St. Francis Medical Center West for August 4, 2005, but was later rescheduled for August 17, 2005. (Bauman Reply, Aff. ¶ 10.) As Aholelei was experiencing gastrointestinal symptoms, he was also scheduled to see a gastroenterologist.

On August 12, 2005, Aholelei reported to sick call complaining of right flank pain and left knee pain. (Bauman Reply, Aff. ¶ 11.) He was able to urinate without difficulty, and was given Motrin.

On August 17, 2005, Aholelei had the KUB, and was subsequently referred to a urologist at Queen Emma Urology Clinic, David Chou, M.D., on September 12, 2005. (Bauman Reply,

---

[12]A "KUB" is an abdominal x-ray to look for certain problems of the of the kidney's, ureters and bladder. See http://urology.caring4health.com

Aff. ¶ 12.)

Prior to seeing Dr. Chou, Dr. Bauman saw Aholelei at the clinic for his kidney stones on August 26 and September 9, 2005. (Paderes Reply, Aff. ¶¶ 44& 46.)

On September 12, 2005, Dr. Chou examined Aholelei and scheduled him for ESWL on the right kidney stone, which Dr. Bauman approved on September 13, 2005.  (Paderes Reply, Aff. ¶¶ 47& 48.)

On September 14, 2005, Dr. Bauman prepared an x-ray consult at St. Francis Medical Center West, with an appointment scheduled for September 27, 2005.  (Paderes Reply, Aff. ¶ 49.)

Aholelei went to the prison medical unit on September 21 and 23, 2005, for complaints unrelated to his kidney condition. (Paderes Reply, Aff. ¶ 50.)  His upcoming kidney stone procedure was noted at both visits by the medical staff.

Aholelei saw Dr. Chou again on October 24, 2005.  (Bauman Reply, Aff. ¶ 13.)  Dr. Chou recommended a fourth procedure to pulverize his kidney stones, laser lithotripsy, which was done on December 9, 2005.  After the lithotripsy, Dr. Chou prescribed Percocet for pain and a follow-up visit in two to three weeks.

On October 26, 2005, Aholelei transferred from Waiawa to Oahu Community Correctional Center ("OCCC").  (Paderes Reply, Aff. ¶ 53.)

Aholelei went to the OCCC medical clinic for a chronic

disease visit on October 31, 2005.  (Paderes Reply, Aff. ¶ 54.)
Multiple problems were noted and he was scheduled to return in
one week.

On November 7, 2005, Aholelei returned to the clinic, where
renal stones were noted and he was referred for a urology
consult.  (Paderes Reply, Aff. ¶ 55.)

On December 7, 2005, a urology consultation at Queen Emma
Clinic was prepared and an appointment was scheduled for December
9, 2005.  (Paderes Reply, Aff. ¶ 56.)

On December 9, 2005, Dr. Chou performed a fifth procedure,
extracorporeal shockwave laser treatment, to resolve Aholelei's
right-side kidney stones.  Aholelei was scheduled for a follow-up
visit scheduled in two to three weeks to check his kidneys,
ureter, and bladder.  (Paderes Reply, Aff. ¶ 57.)

On December 12, 2005, Dr. Chou saw Aholelei for his follow-
up examination at Queen Emma Clinic.  (Bauman Reply, Aff. ¶ 14.)
Dr. Chou told Aholelei to continue taking Percocet until it ran
out and then to take Vicodin, and to have a CT scan in another
month.   Dr. Chou also noted that Aholelei was doing well,
although he still had some pain.  (Paderes Reply, Aff. ¶ 58.)

On December 13, 2005, Dr. Zienkiewicz requested another
urology consult for Aholelei with Dr. Chou.  (Paderes Reply, Aff.
¶ 59.)

On December 27, 2005, Aholelei had a CT scan which revealed

-21-

"light interval growth" in one of his right kidney stones, no remaining calculi in the left upper and lower pole calices, and that the obstructing left calculus and hydronephrosis had resolved completely. (Bauman Reply, Aff. ¶ 15.) There was no evidence of bladder or ureteral calculus found. (Paderes Reply, Aff. ¶ 60.)

On January 9, 2006, Dr. Chou examined Aholelei, who was complaining of a slow urine stream with difficulty voiding. (Bauman Reply, Aff. ¶ 16.) Dr. Chou prescribed Flomax, with a follow-up in six to eight weeks to assess the medicine's efficacy. (Paderes Reply, Aff. ¶ 61.) Dr. Chou also recommended a KUB in six months to reassess Aholelei's kidney stones.

On January 10, 2006, Dr. Zienkiewicz requested a consultation for Aholelei's follow-up with Dr. Chou, and an appointment was scheduled for February 23, 2006. (Paderes Reply, Aff. ¶ 62.)

On February 23, 2006, Dr. Chou again examined Aholelei. (Paderes Reply, Aff. ¶ 63.) Aholelei was complaining of trouble voiding. Dr. Chou scheduled a cystoscopy for April 3, 2006, which was rescheduled for May 25, 2006.

On May 25, 2006, Dr. Chou performed Aholelei's cystoscopy. (Paderes Reply, Aff. ¶ 64.) Dr. Chou determined that Aholelei's bladder was within normal limits, his prostatic urethra was open, his bladder neck appeared closed but was within normal limits and

-22-

without lesions or tumors.  Dr. Chou prescribed Doxazosin,

Vicodin, and Pyridium for pain and dysuria.  He also determined

that no further surgical intervention was necessary at that time.

### LEGAL STANDARD

Summary judgment shall be granted when

the pleadings, depositions, answers to interrogatories,
and admissions on file, together with the affidavits,
if any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to
a judgment as a matter of law.

Fed. R. Civ. P. 56(c); see also Porter v. Cal. Dep't of Corr.,

419 F.3d 885, 891 (9th Cir. 2005); Addisu v. Fred Meyer, Inc.,

198 F.3d 1130, 1134 (9th Cir. 2000).  One of the principal

purposes of summary judgment is to identify and dispose of

factually unsupported claims and defenses.  Celotex Corp. v.

Catrett, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that fails

to demonstrate facts to establish what will be an essential

element at trial.  See id. at 323.  A moving party without the

ultimate burden of persuasion at trial--usually, but not always,

the defendant--has both the initial burden of production and the

ultimate burden of persuasion on a motion for summary judgment.

Nissan Fire & Marine Ins. Co. Ltd. v. Fritz Cos., Inc., 210 F.3d

1099, 1102 (9th Cir. 2000).  The moving party must identify for

the court those "portions of the materials on file that it

believes demonstrate the absence of any genuine issue of material

fact." <u>T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n</u>,
809 F.2d 626, 630 (9th Cir. 1987) (citing <u>Celotex Corp.</u>, 477 U.S.
at 323).      "When the moving party has carried its burden
under Rule 56(c), its opponent must do more than simply show that
there is some metaphysical doubt as to the material facts."
<u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S.
574, 586 (1986) (footnote omitted).  The nonmoving party may not
rely on the mere allegations in the pleadings and instead "must
set forth specific facts showing that there is a genuine issue
for trial."  <u>Porter</u>, 419 F.3d at 891 (quoting <u>Anderson v. Liberty
Lobby, Inc.</u>, 477 U.S. 242, 256 (1986)).  "A genuine dispute
arises if the evidence is such that a reasonable jury could
return a verdict for the nonmoving party."  <u>California v.
Campbell</u>, 319 F.3d 1161, 1166 (9th Cir. 2003); <u>Addisu</u>, 198 F.3d
at 1134 ("There must be enough doubt for a 'reasonable trier of
fact' to find for plaintiffs in order to defeat the summary
judgment motion.").

When "direct evidence" produced by the moving party
conflicts with "direct evidence" produced by the party opposing
summary judgment, "the judge must assume the truth of the
evidence set forth by the nonmoving party with respect to that
fact."  <u>T.W. Elec. Serv.</u>, 809 F.2d at 631.  In other words,
evidence and inferences must be construed in the light most
favorable to the nonmoving party.  <u>Porter</u>, 419 F.3d at 891.  The

-24-

court does not make credibility determinations or weigh

conflicting evidence at the summary judgment stage.  Id.

However, inferences may be drawn from underlying facts not in

dispute, as well as from disputed facts that the judge is

required to resolve in favor of the nonmoving party.  T.W. Elec.

Serv., 809 F.2d at 631.

## DISCUSSION

To state a claim under 42 U.S.C. § 1983, a plaintiff must

allege two essential elements: (1) that a right secured by the

Constitution or laws of the United States was violated, and

(2) that the alleged violation was committed by a person acting

under color of law.  West v. Atkins, 487 U.S. 42, 48 (1988).

I.    Defendants Are Immune From Suit for Damages in Their
      Official Capacities.

As a preliminary matter, Dr. Bauman argues that she is

immune from suit for damages in her official capacity.  The Court

agrees that the Eleventh Amendment bars damage actions against

state officials in their official capacities.  See Doe v.

Lawrence Livermore Nat'l Lab., 131 F.3d 836, 839 (9th Cir. 1997).

Aholelei's Amended Complaint, however, names Drs. Bauman and

Paderes in their individual capacities only.  (See Docket No. 18,

Amd. Compl. at 3.)

II.   Defendants Were Not Deliberately Indifferent.

The Government violates the Eighth Amendment if it fails to

address the medical needs of incarcerated individuals.  Estelle

-25-

v. Gamble, 429 U.S. 97, 104 (1976); Lopez v. Smith, 203 F.3d
1122, 1131 (9th Cir. 2000) (en banc). "[D]eliberate indifference
to serious medical needs of prisoners constitutes the unnecessary
and wanton infliction of pain, proscribed by the Eighth
Amendment." Estelle, 429 U.S. at 102.[13] "A medical need is
serious if the failure to treat the prisoner's condition could
result in further significant injury or the unnecessary and
wanton infliction of pain." Dickey v. Vargo, 2004 WL 825624, at
*2 (D. Or. Feb. 27, 2004) (citing McGuckin v. Smith, 974 F.2d
1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX
Tech., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997)
(further citations omitted)). However,

> a complaint that a physician has been
> negligent in diagnosing or treating a medical
> condition does not state a valid claim of
> medical mistreatment under the Eighth
> Amendment. Medical malpractice does not
> become a constitutional violation merely
> because the victim is a prisoner. In order to
> state a cognizable claim, a prisoner must
> allege acts or omissions sufficiently harmful
> to evidence deliberate indifference to
> serious medical needs. It is only such
> indifference that can offend "evolving
> standards of decency" in violation of the
> Eighth Amendment.

Estelle, 429 U.S. at 106; accord Lopez, 203 F.3d at 1131.

---

[13] For purposes of the Eighth Amendment, serious medical
needs include "the existence of an injury that a reasonable
doctor or patient would find important and worthy of comment or
treatment; the presence of a medical condition that significantly
affects an individual's daily activities; or the existence of
chronic and substantial pain." Lopez, 203 F.3d at 1131.

A difference of opinion between medical professionals concerning the appropriate course of treatment generally does not amount to deliberate indifference to serious medical needs. Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989). To establish that a difference of opinion amounted to deliberate indifference, the prisoner "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances" and "that they chose this course in conscious disregard of an excessive risk to [the prisoner's] health." Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996); see also Hamilton v. Endell, 981 F.2d 1062, 1067 (9th Cir. 1992) (stating that prisoner may demonstrate deliberate indifference if prison officials relied on the contrary opinion of a non-treating physician).

In deciding whether there has been deliberate indifference to Aholelei's serious medical needs, this Court is not required to defer to the judgment of prison doctors or administrators. Hunt v. Dental Dept., 865 F.2d 198, 200 (9th Cir. 1989); Nelson v. Locke, 2005 WL 1030207, *6 (E.D. Wash. May 2, 2005). However, the Ninth Circuit has recognized that a "difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim." Franklin v. State of Or., State Welfare Division, 662 F.2d 1337, 1344 (9th Cir. 1981).

Aholelei alleges that Dr. Paderes and Dr. Bauman, the only

-27-

named defendants to this suit, ignored his serious medical needs.
Because Aholelei alleges that his kidney stones caused him severe
pain, and the record shows that he was provided treatment for
this condition, the Court will assume, for purposes of this
ruling, that Aholelei's  medical condition was serious.

To establish a genuine issue of material fact regarding the
second component of the deliberate indifference test, Aholelei
must present evidence demonstrating that Defendants were aware of
and deliberately disregarded a serious risk to his health.  He
has not done so.

Defendants provide evidence, uncontroverted by Aholelei,
that between October 3, 2002, the date that Aholelei first
complained of kidney pain at the Halawa infirmary, and May 25,
2006, the date that Dr. Chou performed Aholelei's final
cystoscopy and recommended no further surgical intervention,
Aholelei was seen and treated on a regular, consistent basis by
prison officials at Halawa, Waiawa, and OCCC, as well as by
outside urologists, Drs. Kuchenbecker and Chou.

Dr. Paderes personally examined and treated Aholelei, on
December 19, 2002, March 20 and June 13, 2003, and June 8, 2004.
On numerous other occasions, Dr. Paderes supervised Aholelei's
care, provided both within Halawa and outside of the prison, by
reviewing Aholelei's medical records and consultation reports,
discussing the results of Aholelei's various procedures, and

consistently requesting necessary follow-up appointments and procedures.

Dr. Bauman personally treated Aholelei many times, including October 4, 2002, May 27, 2003, April 1 and 29, 2005, July 22, 2005, August 26, 2005, and September 9, 2005. Dr. Bauman also closely supervised Aholelei's medical care by reviewing his charts on numerous occasions, and actively intervened in his care by requesting outside urology consults, CT scans, and surgical procedures.

Aholelei was seen by several other prison physicians including Dr. Young, Dr. Zienkiewicz, and Dr. Abbruzzesse, as well as by prison nurses and medical personnel. Aholelei's medical records show that he was seen at the prison infirmaries for his kidney condition no less than twenty-four times, and seen numerous other times when he did not complain of kidney pain. Aholelei received numerous CT scans, ultrasounds, urinalysis tests, and x-rays for his kidney condition. His medical records were reviewed by Dr. Bauman, Dr. Paderes, Dr. Young, Dr. Zienkiewicz, and by the SURP committee on an ongoing basis to determine the best course of treatment for Aholelei.

Aholelei was also seen for his kidney stone condition by outside physicians, Dr. Kuchenbecker and Dr. Chou. Radiologist Dr. Hamasaki was also consulted for his diagnosis. Aholelei was sent for outside consultations and procedures at Castle Medical

-29-

Center, St. Francis West Medical Center, and the Queen's Urology
Clinic.

Aholelei's kidney stones were actively treated with no less
than five procedures involving extracorporeal and internal laser
shockwave lithotripsy, as well as by ureteroscopy and cystoscopy
procedures.

In addition and concurrent with these surgical procedures,
Aholelei was given pain medication, including Advil, Motrin,
Percocet, and Vicodin, and other medicines to chemically reduce
his kidney stones and control his pain and symptoms.  He was told
to drink plenty of fluids to help pass the stones, which is the
common preventive treatment for kidney stones.  It is abundantly
clear that Aholelei's kidney condition was treated and monitored
on a regular basis.

In addition to the care Aholelei received for his kidney
condition, the record shows that Aholelei was regularly seen at
the various prison infirmaries and clinics, as well as by other
outside physicians, on a daily, weekly, and monthly basis for his
many other complaints and medical conditions.

Defendants also provide a declaration from Herbert K.W.
Chinn, M.D.[14]  (See Paderes Aff. Exh. B.)  Dr. Chinn reviewed

---

[14] Dr. Chinn's curriculum vitae is attached to Dr. Paderes's
Affidavit as Exhibit B-2.  He is Board Certified by the American
Board of Urology, and his practice is in adult and pediatric
urology.

-30-

Aholelei's medical records from Halawa, Castle Medical Center, and Dr. Kuchenbecker.  Dr. Chinn states that, in his professional opinion, Aholelei's medical care was appropriate and well within the standard of care seen in the general community.  Dr. Chinn asserts that Aholelei's care appears to have been as prompt as possible, as dictated by the SURP authorization process and Dr. Kuchenbecker's schedule.

In response to Aholelei's vague claims that Defendants delayed giving care to him for three months, apparently between the time of the April 30, 2003 CT scan and Dr. Kuchenbecker's third ESWL procedure on July 30, 2003, Dr. Chinn states that, as Aholelei had already received two internal laser lithotripsy procedures, and his remaining stones were 5 mm. or less in diameter, these stones reasonably could have been expected to pass spontaneously without surgery.  (See Paderes Aff. Exh. B-1 ("90-95% of stone[s] this size can pass spontaneously without surgery").)

Moreover, in response to Aholelei's claims that he was initially provided with an improper "cheap" procedure, rather than ESWL, Dr. Chinn states that, because Aholelei had a large ureteral obstruction he required the laser lithotripsy first, prior to ESWL.[15]  In addition, Dr. Chinn opines that

---

[15] As noted previously, not all kidney stones can be treated with ESWL, and ureteroscopy and internal lithotripsy may be needed for mid- and lower-ureter stones. (See

-31-

extracorporeal shockwave laser treatment, the procedure Aholelei apparently would have preferred, is not available either for emergency care or on a daily basis, and may well have been unavailable at the Castle Medical Center until July 30, 2003, the date it was performed.  Finally, Dr. Chinn states that, despite Aholelei's claims in the Amended Complaint that he shouldn't have had to undergo three separate treatments, "[f]rom the beginning of his treatment, it was apparent that he would be requiring at least three separate procedures to clear out his stones."  (See Paderes Aff. Exh. B-1, 2.)

Other than his own statements, Aholelei provides no competent evidence that Defendants' treatment of his kidney stones was medically unacceptable.  Nor does Aholelei show that the alleged delay in receiving any of his procedures resulted in further injury.  See Shapley v. Nev. Bd. of State Prison Com'rs, 766 F.2d 404, 407 (9th Cir. 1985) ("[M]ere delay of surgery, without more, is insufficient to state a claim of deliberate medical indifference.").  Although Aholelei argues that the delay resulted in more harm to him, this is not born out by Dr. Kuchenbecker's post-operative reports, his medical charts, Dr. Chou's examinations, or Dr. Chinn's review of his medical care.

_____

http://www.kidney.niddk.nih.gov see supra note 6.) This involves removing the stone with either a cage-like device or shattering it with a special instrument that produces a form of shock wave ("lithotripsy").  (Id.) It appears that Aholelei received both types of treatments, in addition to ESWL.

-32-

Moreover, Aholelei's unsubstantiated statements that Dr. Kuchenbecker told him that he had recommended a pain free, more expensive procedure, but Halawa officials denied this request in lieu of a "cheap and painful" treatment, are not sufficient to overcome a motion for summary judgment. See Fed. R. Civ. P. 56(e); Beyene v. Coleman Sec. Servs., Inc., 854 F.2d 1179, 1181 (9th Cir. 1988) (the trial court can only consider admissible evidence in ruling on a motion for summary judgment). First, Aholelei does not support this allegation by competent evidence, such as an affidavit from Dr. Kuchenbecker. Second, Dr. Kuchenbecker's alleged statement is hearsay which is not subject to any exception. Finally, even accepting this statement as true, Aholelei has not shown that Drs. Bauman and Paderes chose a different course of treatment than what was allegedly recommended by Dr. Kuchenbecker that was "medically unacceptable under the circumstances" and "that they chose this course in conscious disregard of an excessive risk to [the prisoner's] health." See Jackson, 90 F.3d at 332.

Because courts lack medical expertise, where prisoners receive "some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgment." Miranda v. Munoz, 770 F.2d 255, 259 (1st Cir. 1985); Layne v. Vinzant, 657 F.2d 468, 474 (1st Cir. 1981). Although Aholelei may disagree with the course

of treatment he received, his difference of opinion with his treating physicians' opinions does not give rise to a claim under the Eighth Amendment.  See Franklin, 662 F.2d at 1344; Miranda, 770 F.2d at 259.

The Court concludes that Aholelei has failed to present any evidence in opposition to the motion for summary judgment demonstrating a genuine issue for trial regarding deliberate indifference to a serious medical need.  Even viewing the facts in a light most favorable to Aholelei, they fail to establish as a matter of law that Dr. Paderes or Dr. Bauman acted with deliberate indifference to Aholelei's serious medical needs. Aholelei has simply failed to show that Defendants knew of a substantial risk of harm to him, if any, drew that inference, and purposefully ignored, disregarded, or failed to address that risk.  To the contrary, the record establishes that Aholelei was given prompt, appropriate medical care for his kidney stone condition.  Defendants' Motions for Summary Judgment are GRANTED.

III. Defendants Are Entitled to Qualified Immunity.

Bauman and Paderes also assert, in the alternative, that they are entitled to qualified immunity.

Saucier v. Katz, 533 U.S. 194 (2001), sets forth a two-step inquiry for determining whether qualified immunity applies. First, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged [must] show [that]

-34-

the officer's conduct violated a constitutional right." Id. at
201.  This prong of the Saucier inquiry "mirrors the substantive
summary judgment decision on the merits." Sorrels v. McKee, 290
F.3d 965, 969 (9th Cir. 2002).  "If no constitutional right would
have been violated were the allegations established," the inquiry
ends.  Saucier, 533 U.S. at 201.  If there appears to have been a
constitutional violation, however, the second step is to
determine whether the right in question was "clearly established
. . . in light of the specific context of the case, not as a
broad general proposition." Id.; Walker v. Gomez, 370 F.3d 969,
974 (9th Cir. 2004).

As detailed above, the facts as alleged by Aholelei do not
show that Defendants violated Aholelei's constitutional right to
be free from cruel and unusual punishment by failing to provide
him with timely and adequate medical treatment for his kidney
stones.  See Saucier, 533 U.S. at 201.  Defendants are entitled
to qualified immunity for Aholelei's claims against them.

IV.  Aholelei Lacks Standing to Assert Constitutional Rights of
     Other Inmates.

In his Oppositions to Defendants' Motions, Aholelei alleges
that his supposedly inadequate medical treatment is part of a
larger, "systematic pattern of injury," against Halawa inmates.
(Aholelei's Opp. to Paderes's Mot. at 5.)  Aholelei further
alleges, somewhat confusingly, that "third party evidence is
important and necessary to show a satictical [sic] pattern of

-35-

inadequate medical care[,]" although he submits no "third party" or statistical evidence of a pattern of abuse at Hawaii's prisons. (Aholelei's Opp. to Paderes's Mot. at 5.)  Apparently, Aholelei is attempting to maintain a class action on behalf of other Halawa inmates.

Ordinarily, a plaintiff does not have standing to assert deprivation of other's constitutional rights. Powers v. Ohio, 499 U.S. 400, 410 (1991). Moreover, as a *pro se* plaintiff, Aholelei cannot "fairly and adequately protect the interests of the class," as required by Fed. R. Civ. P. 23(a)(4). See Oxendine v. Williams, 509 F.2d 1405, 1407 (4th Cir. 1975) (per curium) (plain error to permit imprisoned litigant, unassisted by counsel, to represent fellow inmates in a class action). Although a non-attorney may appear *pro se* on behalf of himself, he has no authority to appear as an attorney for others. C.E. Pope Equity Trust v. United States, 818 F.2d 696, 697 (9th Cir. 1987). Also, "[e]very court that has considered the issue has held that a prisoner proceeding *pro se* is inadequate to represent the interests of his fellow inmates in a class action." Caputo v. Fauver, 800 F. Supp. 168, 170 (D.N.J. 1992) aff'd, 995 F.2d 216 (3rd Cir. 1993). Aholelei has neither sought nor was he granted class certification in this action. He is not qualified to pursue these claims on behalf of other inmates or to protect other inmates' interests. Defendants are also granted summary

-36-

judgment as to these claims.

## CONCLUSION

Defendants' Motions for Summary Judgment are GRANTED.  The Clerk of Court is directed to enter judgment for Defendants and close the file.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, September 21, 2006.



_/s/ Helen Gillmor_____
Chief United States District Judge

AHOLELEI v. KYSAR, et al., CIV. NO. 03-00171 HG-KSC; ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; dmp\ Orders 06\ Aholelei MSJ revised